UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____3/15/19____

ROSA MARIA RIVERA,

          Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

18-CV-372 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Rosa Maria Rivera brings this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Plaintiff was represented by counsel before the Social Security Administration (SSA), but filed this action *pro se*. The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 12.) Now before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 14.) For the reasons set forth below, the Commissioner's motion will be granted.

## I.    BACKGROUND

### A.    Procedural Background

On June 8, 2014, plaintiff submitted applications for DIB and SSI, asserting disability due to lumbar sacral radiculopathy, high blood pressure, and bulging disc. *See* SSA Administrative Record (Dkt. No. 9) (hereinafter "R. __"), at 196, 200, 224. Both claims were denied on September 30, 2014. (R. 136.) On November 7, 2014, plaintiff requested a hearing before an Administrative Law Judge (ALJ) (R. 144, 147), which took place on April 25, 2016, before ALJ Janet M. McEneaney. (R. 94.)

In a written decision dated October 25, 2016 (Decision), the ALJ determined that plaintiff was not disabled within the meaning of the Act. (R. 13-24.) On November 1, 2016, plaintiff requested Appeals Council review. (R. 195.) The Appeals Council denied that request on November 14, 2017 (R. 1), making the ALJ's determination final.

**B.** **Personal Background**

Plaintiff was born on August 9, 1960. (R. 196.) She went to school through ninth grade, in New York. (R. 99.) For most of her adult life plaintiff did not work outside the home, instead staying home to raise her five children. (R. 197.) Plaintiff joined the workforce in 2007 and worked in retail sales from 2007 to 2011. (R. 101, 197.) She was laid off in 2012. (R. 197.) For approximately two months in 2013, plaintiff worked in cleaning and maintenance as a seasonal parks worker. (R. 101.) She then worked for a few weeks in January 2014 cleaning bathrooms, but stopped working in February 2014 when she started "feeling the pain." (R. 101, 197.)

As of April 20, 2015 (when plaintiff testified in front of the ALJ), she lived in an apartment with three of her five adult children, and two of her grandchildren, ages three and four. (R. 96-98.) She took care of her grandchildren – with their mother present – approximately twice a week, watching TV with them, reading them books, and feeding them, but did not take them outside. (R. 97-99, 115.) According to a Function Report that plaintiff completed on July 28, 2014, her daily activities included basic hygiene and personal care, eating, going to appointments if she had them, taking her medication, and going to bed. (R. 233.) She wrote that she woke up in chronic pain in the middle of the night, and that while she "used to walk blocks," she could no longer "even walk a block." (*Id.*) However, she stated that she could dress, bathe, and care for her hair slowly, and had no problem shaving, feeding herself, or using the toilet. (R. 233-34.) She also noted that she prepared meals with the help of her adult daughter. (R. 235.) Plaintiff wrote that she needed help

with household chores, except for sweeping, which she could do "little by little." (R. 235.) She wrote that she could go out alone and could use public transportation, but did not shop or do any social activities; however, she listed the "store" as a place she went on a regular basis. (R. 235, 237.)

Turning to her functional limitations, plaintiff reported that she could lift "maybe 5, 10" pounds," could stand "no more than 10 to 15 minutes," could walk one block before needing to sit down, could sit "no more than 45 minutes," and could not climb stairs, kneel, or squat. (R. 237-38.) She wrote that she could reach (depending on "how high"), could use her hands, and had no issues seeing, hearing, or talking. (R. 238.) She reported that she needed a cane and a back brace "always[s]." (R. 238-39.) She also wrote that she was talking Mapap and Percocet for her pain, and that Percocet caused drowsiness and numbness. (R. 241-42.)[1]

## II. PLAINTIFF'S MEDICAL HISTORY

### A. Treatment Records

#### 1. United Medicine & Rehabilitation

On April 25, 2014, physical medicine and rehabilitation physician Aleksandr Levin, M.D. saw plaintiff for an initial evaluation. (R. 387.) Plaintiff complained of dizziness, pain in her upper extremity and lower back, numbness, and paresthesia. (*Id.*) Dr. Levin noted that the pain was exacerbated by bending down, pulling, lifting, prolonged sitting, weather changes, and "ambulation x 2 blocks," but not by going up or down stairs, squatting, walking, grasping, pushing, carrying heavy objects, prolonged standing, laying down, or getting up from a sitting position. (*Id.*)

---

[1] Mapap is a brand name for acetaminophen, an over-the-counter pain reliever and fever reducer. Percocet (oxycodone and acetaminophen) is a narcotic analgesic indicated "for the relief of moderate to moderately severe pain." RxList, "Percocet," https://www.rxlist.com/percocet-drug.htm (last accessed March 14, 2019).

Dr. Levin performed a physical examination, assessed plaintiff with lumbosacral sprain/strain and lumbar radiculitis, and prescribed physical therapy. (R. 389.)

A May 16, 2014 letter from United Medicine & Rehabilitation "[t]o whom this may [c]oncern" reported that plaintiff was "a patient at our facility" who was seeing Dr. Levin for pain management and was "receiving Physical Therapy." (R. 304.) The letter stated that plaintiff had chronic back pain, and due to "her diagnosis of Lumbar Sacral Radiculopathy she [was] required to be in physical therapy at least three times a week." (*Id.*)

Plaintiff underwent physical therapy at United Medicine & Rehabilitation throughout 2014, 2015, and 2016. (*See* R. 352-84.) The notes of those sessions are often unintelligible, but they do reflect that plaintiff consistently reported back, hip, hand and knee pain at levels between 5/10 and 9/10. (*See* R. 352, 357, 363, 370, 376.) She also reported throughout this period that bending, lifting, sitting, stairs, and dressing exacerbated her pain. (R. 360, 366, 373, 378.) Over the same period, Dr. Levin continued to prescribe Percocet (R. 319); in March 2015, he added Voltaren. (R. 284.)[2]

On March 21, 2016, Dr. Levin saw plaintiff for a follow-up examination. Plaintiff complained of headache, lower back pain, and knee pain. (R. 385.) A physical examination revealed decreased ranges of motion and tenderness in the neck and lumbar spine. (*Id.*) Dr. Levin diagnosed "cervical radiculitis" and prescribed additional physical therapy. (R. 385-86.)

---

[2] Voltaren (diclofenac sodium) is a nonsteroidal anti-inflammatory drug (NSAID) indicated for relief from the signs and symptoms of osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. RxList, "Voltaren," https://www.rxlist.com/voltaren-drug.htm (last accessed March 14, 2019).

## 2. Neighborhood & Family Health Center

Family nurse practitioner Meredith Gentes, FNP, wrote a letter "[t]o whom it may concern," dated July 31, 2014, on the letterhead of Neighborhood & Family Health Center (N&FHC) (R. 307), reporting that plaintiff was "a patient at our clinic" and had "chronic lower back pain with lower thoracic disc disease and disc bulging." (*Id.*) Nurse Gentes wrote that plaintiff was "unable to sit for long periods, stand for longer than 15 minutes, walk upstairs, or bend over without severe back pain" and would be "re-evaluated in 3 months." (*Id.*)

Family nurse practitioner Carly Skinner, FNP-BC confirmed in a letter dated November 25, 2014, also on the letterhead of N&FHC, that plaintiff remained "a patient at our clinic." (R. 300.) Nurse Skinner wrote that plaintiff had "many medical comorbidities, including hypertension, obesity, vitamin D deficiency, and chronic low back pain with reported lower thoracic disc disease at the L3-L4 disc, L4-L5 disc, and L5-S1 disc." (R. 300.) On exam, plaintiff "exhibit[ed] lower back pain" and could not "stand for long periods of time." (*Id.*) Nurse Skinner added that plaintiff was "receiving pain medications through a pain specialist and sees a physical therapist to help with daily functions." (*Id.*) There are no other documents from N&FHC in the record of this action.

## 3. Narco Freedom, Inc.

According to plaintiff, she saw three medical professionals at Narco Freedom, Inc. (Narco Freedom) during the relevant period: internist Ricardo O. Dunner, M.D./M.P.H., pediatrician Jennifer Fisher, M.D., and "Dr. Meredith Gentes," presumably meaning Nurse Gentes. (R. 228.)[3]

---

[3] The Court notes that the address plaintiff provided for Narco Freedom is the same as the address of N&FHC (*see* R. 88, 228, 300), and further notes that, according to publicly available records, N&FHC was operated by Narco Freedom. *See, e.g.*, Answer, *Rivera v. Narco Freedom, Inc., individually and d/b/a Neighborhood & Family Health Center and Dr. Ricardo Dunner, M.D., individually*, No. 14-CV-1126 (GBD) (S.D.N.Y. May 21, 2014) at 2 (admitting that N&FHC was a d/b/a of Narco Freedom). Narco Freedom's website states that it "is no longer operating clinical and housing programs," having in September 2015 "transitioned its [] clinical programs and houses

The record contains no treatment notes from Dr. Dunner or Dr. Fisher. However, pharmacy records and plaintiff's own statements evidence the treatment that they provided. Plaintiff saw Dr. Dunner beginning in 2013 for "exams and medications." (R. 261.) She saw him again in August 2014. (*Id.*) At various points in 2015, he prescribed plaintiff Nifedipine, Pravastatin Sodium, Vitamin D, Aspirin, and Bacitracin. (R. 284-85.)[4] In addition, Dr. Dunner signed a Medical Report concerning plaintiff, which is discussed *infra* in section II(C)(1). Plaintiff saw Dr. Fisher beginning in 2012, for "exams and prescription pills," and saw her again in September 2014. (R. 261.) Pharmacy records reflect that Dr. Fisher prescribed plaintiff Benadryl in December 2014. (R. 284.)[5]

### B.    Diagnostic Testing

The record contains a number of diagnostic testing and lab reports, summarized below.

March 6, 2014: An MRI of plaintiff's lumbar spine revealed "lower thoracic disc disease," including "loss of discal T2 weighted signal with a moderate disc bulge and thecal sac compression and bilateral neural canal narrowing" at L3-L4, L4-L5, and L5-S1. (R. 291.) However, for each of those discs, the "visualized nerve roots reveal[ed] no evidence of structural abnormality," and the "residual neuroforamen" were "adequate." (*Id.*)

---

in the Bronx to Samaritan Village." *See* "Important Information About Narco Freedom, Inc.," http://www.narcofreedom.com/ (last accessed March 14, 2019).

[4] Nifedipine is indicated for the management of vasospastic angina, chest pain resulting from an inadequate supply of oxygen to the heart muscle. RxList, "Procardia," https://www.rxlist.com/procardia-drug.htm (last accessed March 14, 2019). Pravastatin Sodium is indicated for the prevention of cardiovascular disease and the reduction of total cholesterol. RxList, "Pravachol," https://www.rxlist.com/pravachol-drug.htm (last accessed March 14, 2019). Bacitracin is an over-the-counter antibiotic. Aspirin is an over-the-counter analgesic.

[5] Benadryl (diphenhydramine) is indicated for the temporary relief of symptoms due to hay fever, other respiratory allergies, or the common cold. RxList, "Benadryl," https://www.rxlist.com/benadryl-drug.htm (last accessed March 14, 2019).

April 25, 2014: A Lower Extremity Physiologic Study was normal. (R. 342.)

July 7, 2014: An Upper Extremity Arterial Ultrasound and Doppler was "abnormal" and showed "velocities higher than expected on the left side." (R. 341.)

December 6, 2014: An MRI of plaintiff's left knee revealed "joint effusion," a "partial ACL tear," a "Grade I-II LCL sprain," a "tear of the anterior horn of the lateral meniscus," and "tear of the posterior horn of the medial meniscus." (R. 299.)

March 30, 2015: A Duplex Doppler of L/E Venous System revealed "no evidence of deep vein thrombosis in the lower extremities." (R. 344.)

April 17, 2015: A Lower Extremity Physiologic Study was "consistent with mild PAD" (peripheral artery disease). (R. 343.) A Peripheral Arterial Ultrasound and Doppler that same day revealed no evidence of "hemodynamically significant stenosis," but did show mild bilateral "CFA [common femoral artery] and SFA [superficial femoral artery] mid/distal disease" and "mild left popliteal disease." (R. 345.)

May 29, 2015: Electromyography (EMG) / Nerve Conduction Velocity (NCV) Lower studies revealed "no evidence of lumbar radiculopathy or peripheral neuropathy." (R. 335.)[6] EMG/NCV Upper studies that same day were normal, except that the "left median sensory nerve revealed prolonged distal latency." (R. 338.) The study revealed "evidence of a mild left carpal tunnel syndrome (median nerve entrapment at wrist) affecting sensory components." (*Id.*) Dr. Levin prescribed a wrist splint. (*Id.*) A Carotid Artery Duplex and Doppler Study, also conducted

---

[6] Radiculopathy refers to the symptoms "produced by the pinching of a nerve root in the spinal column," including "pain, weakness, numbness and tingling." Johns Hopkins, "Radiculopathy," https://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/acute_radi culopathies_134,11 (last visited March 14, 2019). Lumbar radiculopathy, sometimes known as sciatica, involves the nerve roots in the lower back. *Id.* "Peripheral neuropathy is the damage of the peripheral nervous system, such as carpal tunnel syndrome that involves trapped nerves in the wrist." *Id.*

the same day, revealed mild "atherosclerosis of the carotid arteries with no definite evidence of hemodynamically significant stenosis," and noted mild "proximal CCA [common carotid artery] plaque." (R. 346-47.) A Bilateral Shoulders Ultrasound revealed "[t]hickening and irregularity of the supraspinatus tendon bilaterally, suggestive of rotator cuff pathology." (R. 348.)

September 25, 2015: An Upper Extremity Arterial Ultrasound and Doppler revealed no "definite evidence of hemodynamically significant stenosis." (R. 350.)

December 7, 2015: Plaintiff underwent a series of neurological tests, including a Videonystagmography performed by Dmitriy Kolesnik, M.D., who reported to Dr. Levin that the results were largely normal, except that plaintiff's "eye movement recordings in the pursuit 4 Hz tests showed abnormal gain and abnormal phase horizontally," "eye movement recordings in the pursuit 2 Hz tests showed abnormal gain and normal phase horizontally," and "[p]osturography revealed impaired balance and postural instability." (R. 325.) Dr. Kolesnik concluded that these findings were "non-localized" and "may be caused by medications, patient's inattention or nonspecific age related changes." (*Id.*)

December 9, 2015: X-rays of plaintiff's "Left Knee DX Lateral w/ Obliques" revealed "degenerative osteoarthritic changes in left knee joint, particularly affecting its lateral compartment, with small left suprapatellar bursal effusion," but otherwise "no evidence of acute pathology identified." (R. 318.)

December 18, 2015: X-rays of plaintiff's "Right Hip(s) DX Unilateral" revealed no "fracture or dislocation," and no "significant productive degenerative change." (R. 316.) X-rays of plaintiff's "Bilateral Knee DX AP & Lateral w/ Obliques" revealed: "Mild narrowing of the medial joint compartment of the right knee"; "[n]arrowing of the patellofemoral joint compartment bilaterally"; "[s]purring of the medial femoral and tibial condyles bilaterally"; "[s]purring of the

lateral femoral condyle on the left"; "[s]purring of the tibial spines bilaterally"; and "[m]ild degenerative osteoarthritic change in both knees." (R. 317.) However, there was "no fracture or dislocation" and "no joint effusions." (*Id.*)

February 5, 2016: A Duplex Doppler of L/E Venous System revealed "no evidence of deep vein thrombosis in the lower extremities bilaterally." (R. 349.)

May 6, 2016: A Lower Extremity Physiologic Study revealed "[s]evere resting HTN [high blood pressure] with physiology consistent with mild/moderate PAD." (R. 39.)[7]

July 22, 2016: An EMG/NCV Lower study revealed "evidence of a chronic denervation limited to the right lumbosacral paraspinal muscles." (R. 35.)

October 28, 2016: An EMG/NCV Upper study of plaintiff's left median motor nerve revealed "evidence of a moderate left sensorimotor median nerve neuropathy at the wrist," consistent with carpal tunnel syndrome. (R. 33.)

September 8, 2017: Plaintiff underwent an Infrared/Video ENG test, the results of which are not analyzed in the record. (R. 30.) On the same day, Dr. Kolesnik reported to Dr. Levin the results of another Videonystagmography, similar to the December 7, 2015 report. (R. 34.)

C.     **Opinion Evidence**

1.     **Dr. Dunner**

On May 20, 2014, Dr. Dunner completed a one-page Medical Report concerning plaintiff on a form provided by FEGS (Federation Employment & Guidance Service). (R. 289.)[8] Dr. Dunner

---

[7] The May 6, 2016 study, as well as the later studies and reports listed below, were supplied to the SSA by plaintiff after the ALJ's Decision. (*See* R. 30-40.)

[8] FEGS was a New York City program that provided assistance to individuals with complex clinical barriers to employment, including medical, mental health, and substance abuse conditions, to obtain employment or disability benefits. *See Morales v. Colvin*, 2015 WL 2137776, at *7 n.16 (S.D.N.Y. May 4, 2015) (citations omitted).

listed plaintiff's diagnoses as chronic lower back pain, hypertension, and obesity. (*Id.*) Relevant clinical findings included lumbar spine disease and bulging disc as reflected on the March 6, 2014 MRI. (*Id.*) Dr. Dunner described plaintiff's clinical course as: "Referral to pain management with ongoing [unintelligible]" and "Presently in physical therapy 3x weekly." (*Id.*) On a one-page "Physician's Functional Assessment Form" completed the same day, Dr. Dunner checked a box to assert that plaintiff was "[u]nable to work for at least 12 months (may be eligible for long-term disability benefits)," and wrote underneath, "ongoing tx pending pain management/PT with no improvement." (R. 290.) He did not describe any specific functional limitations.

### 2.  Neighborhood & Family Health Center

In Nurse Gentes's July 31, 2014 letter, she wrote that plaintiff was "unable to sit for long periods, stand for longer than 15 minutes, walk upstairs, or bend over without severe back pain." (R. 307.) In Nurse Skinner's November 25, 2014 letter, she reported that plaintiff could not "stand for long periods of time." (R. 300.)

### 3.  Dr. Mescon

On September 17, 2014, internist Marilee Mescon, M.D. performed a consultative examination of plaintiff on referral from the Division of Disability Determination. (R. 294.) Plaintiff reported to Dr. Mescon that the pain in her back ranged from 7/10 to 4/10 "with analgesic medications." (*Id.*) She told Dr. Mescon that "she uses a brace, but she left her brace at home." (*Id.*) She also stated that the pain in her back was equal when she bent down and when she stood up. (*Id.*)

Plaintiff told Dr. Mescon that "she can sit for one hour, stand for 15 minutes, and walk about 15 minutes." (R. 294.) Dr. Mescon noted that plaintiff "never went to an emergency room," "never had epidural injections," and "never had surgery for her back." (*Id.*) She also noted that

plaintiff "can cook," "does the cleaning, laundry, and shopping," and could "shower, bathe, and dress." (R. 295.) Plaintiff told Dr. Mescon that she started smoking cigarettes in 1976 and still continued "to smoke from three or four cigarettes up to one pack of cigarettes a day." (*Id.*) Dr. Mescon also reviewed the March 6, 2014 MRI of plaintiff's lumbosacral spine. (R. 294.)

Dr. Mescon observed that the plaintiff was in "no acute distress," with a "normal" gait, was able to "walk on heels and toes without difficulty," used "no assistive devices," needed "no help changing" for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (R. 295.) However, plaintiff could "only squat halfway down." (*Id.*)

Dr. Mescon found that plaintiff's cervical spine and lumbar spine each showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (R. 296.) Plaintiff's joints were "stable and nontender," with no redness or swelling. (*Id.*) Plaintiff had "diminished sensation over the right lateral thigh," but full strength in the upper and lower extremities, and no muscle atrophy. (*Id.*) Dr. Mescon diagnosed back pain, high blood pressure, and obesity. (R. 297.) Dr. Mescon concluded, on the basis of her examination, that plaintiff had "no limitations" in her "ability to sit, stand, climb, push, pull, or carry heavy objects at this time." (R. 297.)[9]

### 4. Dr. Levin

On December 26, 2017 – fourteen months after the ALJ issued her Decision – Dr. Levin signed a letter verifying that plaintiff "is a patient at our facility," and that she "has a diagnosis of Lumbar Sacral Radiculopathy and Cervical Radiculitis." (R. 29.) Dr. Levin stated that due to plaintiff's "chronic back pain and pinch [sic] nerves she has limited mobility which requires her

---

[9] However, in light of plaintiff's elevated blood pressure (162/102), Dr. Mescon advised her to "go back to her private doctor immediately and [have] her blood pressure reassessed." (R. 297.)

to walk with a walker," and opined that "Ms. Rivera is unable to push, pull or carry [more] than 15 pounds and not able to stand or sit more than 15 mins." (R. 29.) There is no retrospective language in the letter.

## III.  HEARING

On April 25, 2016, plaintiff appeared, with counsel, for a hearing before ALJ McEneaney. (R. 92.) The hearing was held "for the Jersey City Hearing Office," though ALJ McEneaney presided by video from Brooklyn, and plaintiff appeared, with counsel, in the Bronx. (R. 94.) Also present were vocational expert (VE) Marian R. Marracco and hearing reporter Mr. Ross. (*Id.*)[10]

### A.  Plaintiff's Testimony

Plaintiff's attorney began the hearing by arguing that plaintiff had a "combination of impairments that we think are severe," including "back pain, knee pain, hip pain, high blood pressure, shoulder and carpal tunnel syndrome." (R. 95.) He then argued that "she could meet listing 1.04" (*id.*), or – alternatively – would have an RFC limited to "sedentary at most which at her age over 50, she could grid favorably." (R. 95-96.)

Plaintiff testified that her medical conditions included "chronic pain," that her knees "rip," and that she had arthritis in her right side and hip, high blood pressure, and carpal tunnel syndrome. (R. 102-03.) She testified that the medication she took for carpal tunnel syndrome helped, and that the medication she took for pain also helped, reducing her pain to "mild" (R. 103-04), but making her sleepy and dizzy. (R. 104.) Plaintiff said that she could walk two blocks before stopping to sit (or, if she had her walker, to rest in her walker). (R. 104-05.) She testified that Dr. Levin prescribed a walker, but that most days, she used a cane instead. (R. 105.) She stated that she needed the cane

---

[10] The hearing transcript misspells VE Marracco's name "Morocco." (*Compare* R. 92 *with* R. 286.) It is not clear from the transcript whether Ms. Marracco and Mr. Ross were in Brooklyn, the Bronx, or elsewhere.

to get up and down and for balancing. (R 106.) She testified that she could "stand ten minutes" before having to sit down, and could sit "30 to 40 minutes" before having to stand. (*Id.*) She could "lift maybe ten pounds," could reach up to her height, could reach out in front of her, and could climb "like four or five steps" with her cane. (R. 107-08.)

Concerning daily activities, plaintiff testified that she got dressed by herself, cooked and went shopping "sometimes," did not do laundry, cleaned on "good days," and was able to shower by herself. (R. 109-10.) She said she took the bus to appointments but never went out with friends or to a restaurant or a movie. (R. 110.) She testified that she had three or four good days in a week. (R. 111.) In response to questions from her attorney, plaintiff testified that on her bad days, she had "chronic pain" (R. 113-14), meaning "that I cannot even walk, get out of bed. It's like I'm stuck to the bed." (R. 114.) She said that these bad days happened two or three times a week. (*Id.*)

### B.     VE Testimony

VE Marracco identified the titles, exertional levels, and DOT numbers for each of the three jobs performed by plaintiff in the past (park attendant, sales attendant, and cleaner). (R. 117-18.) The ALJ then provided a hypothetical:

> So let us assume a person with the Claimant's age, education and work experience, who's able to perform the full range of light duties as prescribed in the regulations with the following limitations: Person is allowed to sit or stand alternately, provided that she is not off task more than 5% of the work period; occasionally climbs ramps or stairs; never climbs ladders, ropes or scaffolds; occasionally stoops, crouches or kneels; never crawls. . . . Only occasional overhead reaching; limited [to] jobs that can be performed while using a hand-held assistive device with the dominant hand for ambulation and standing.

(R. 118.) The ALJ asked whether that hypothetical claimant could perform any of plaintiff's past work. (*Id.*) VE Marracco testified that she could perform the job of a sales attendant. (R. 119.)

The ALJ then presented VE Marracco with a second hypothetical claimant, with plaintiff's age, education, and work experience, who was able "to perform the full range of sedentary duties,"

further limited as in the first hypothetical. (R. 119.) VE Marracco testified that the hypothetical

claimant could perform the sedentary jobs of document preparer (DOT 249.587.018, SVP 2,

national employment figure of 38,000), greeter (DOT 237.367-018, SVP 2, national employment

figure of 956,000), and order clerk for food and beverage (DOT 209.567-014, SVP 2, national

employment figure of 208,800). (R. 119.)

In response to a third hypothetical – identical to the second, but with the additional

limitation that there would be "no exposure to moving machinery, unprotected heights or driving

vehicles" – VE Marracco confirmed that such a hypothetical claimant could also perform the jobs

identified in response to the second hypothetical. (R. 120.)

Finally, the ALJ presented VE Marracco with a fourth hypothetical:

> Thank you, and Hypothetical #4, please assume the same individual as in
> Hypothetical #3 with one more limitation and that would be due to accommodation
> of medical condition and pain. This person is unable to engage in sustained work
> activity for a full eight-hour workday on a regular and consistent basis and would
> there be work in the national economy for such an individual?

(R. 120.) VE Marracco testified that this limitation "would preclude employment." (*Id.*)

## IV.  ALJ DECISION

### A.  Standards

In her October 25, 2016 Decision, the ALJ correctly set out the five-step sequential

evaluation process used pursuant to 20 C.F.R. §§ 404.1520(a) and 416.920(a) to determine whether

a claimant over the age of 18 is disabled within the meaning of the Act. (R. 14-15.) The Second

Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. Where the claimant is not, the Commissioner next
> considers whether the claimant has a "severe impairment" that significantly limits
> her physical or mental ability to do basic work activities. If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on medical evidence,
> the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app.

1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's residual functional capacity (RFC), age, education, and past relevant work experience. *See* 20 C.F.R. §§ 404.1512(f) (2015), 404.1560(c), 406.912(f) (2015), 416.960(c).[11] "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Prior to steps four and five, the ALJ must determine the claimant's RFC, that is, the "most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant's RFC is determined based on all of the relevant medical and other evidence in the

---

[11] 20 C.F.R. §§ 404.1512 and 406.912 were amended effective March 27, 2017. In this Opinion and Order, I quote and I apply the regulations as they existed at the time of the Commissioner's Decision. Citations to regulations that have since been amended include the date of the version that was in effect at that time.

record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. *Id.* §§ 404.1545(a)(3), 416.945(a)(3).

### B.     Application of Standards

At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since February 22, 2014, the alleged onset date." (R. 15.)

At step two, the ALJ found that plaintiff had the severe impairments of "[d]egenerative disc disease, meniscal tears of bilateral knee, right hip arthritis, carpal tunnel syndrome, hypertension, vertigo, and obesity." (*Id.*)

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments" meeting or equaling "the severity of one of the listed impairments of 20 CFR Part 404, Subpart P, Appendix 1." (R. 15-16.) The ALJ considered Listings 1.02 ("Major dysfunction of a joint(s)"), 1.03 ("Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively"), and 1.04 ("Disorders of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord"). (R. 15-17.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 1.02, 1.03, 1.04.

Before proceeding to step four, the ALJ determined plaintiff's RFC:

> I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can sit/stand alternately at will as long as she is not off task more than 5% of the work period. Occasionally, she can climb ramps or stairs; however, never climb ladders, ropes, scaffolds. Occasionally, she can stoop, crouch, kneel; however, never crawl. She is limited to jobs that she can perform while using a hand held assistive device in the dominant hand at all times when standing. Occasionally, she can reach overhead.

(R. 17.) In determining plaintiff's RFC, the ALJ considered her complaints of pain and statements about her own limitations. (*Id.*) However, the ALJ found that plaintiff's "statements concerning

the intensity, persistence and disabling effects of these symptoms are not consistent with the totality of the medical evidence of record." (*Id.*)

The ALJ also considered plaintiff's treatment history, the objective medical evidence, and the opinion of Dr. Mescon, which she gave "significant weight." (R. 17-22.) The ALJ did not specifically discuss Dr. Dunner's assessment that plaintiff was "[u]nable to work for at least 12 months" (R. 290), or Nurse Gentes's statement that plaintiff was "unable to sit for long periods, stand for longer than 15 minutes, walk upstairs, or bend over without severe back pain." (R. 307.) She did state, more generally, that "no treating source has offered an opinion as to the nature and severity of the claimant's impairments, or how they impact her ability to perform basic work-related activities." (R. 22.)

At step four, on the basis of her RFC determination, the ALJ found plaintiff "capable of performing past relevant work as a Sales Attendant DOC code 299.677-010, which is unskilled in complexity with a SVP of 2; and a light exertional demand." (R. 22-23.) The ALJ based this determination on VE Marracco's opinion that "an individual with the claimant's age, education, wok experience, and residual functional capacity could work at the claimant's past relevant work as a Sales Attendant as it is generally performed in the national economy." (R. 23.)

On the basis of her step four determination, the ALJ found that plaintiff had not been under a disability, as defined in the Act, from February 22, 2014, through the date of the Decision. (*Id.*)

## V. ANALYSIS

The Commissioner argues that she is entitled to judgment on the pleadings because (1) the ALJ fulfilled her duty to develop the record by, *inter alia*, making repeated requests for evidence from plaintiff's treating providers and obtaining opinion evidence from consultative examiner Dr. Mescon; (2) the ALJ's decision to discount plaintiff's credibility was supported by substantial

evidence, as was her RFC determination; (3) the ALJ properly weighed the opinion evidence in the record; and (4) plaintiff's post-Decision evidence is neither "new" nor "material." Def. Mem. (Dkt. No. 15) at 13-24. In response to the Commissioner's motion, plaintiff submitted a brief letter, dated October 29, 2018 (Dkt. No. 18), asserting that all of her impairments "have gotten far worse," and that she no longer has "no pain days," even when she takes her medication.

To prevail on a motion for judgment on the pleadings, the Commissioner must establish that no material facts are in dispute and that judgment must be granted as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Commissioner of Social Security*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The law governing cases such as this is clear. The reviewing court "may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, the district court must first decide whether the ALJ applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation adopted*, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008). If there was no legal error, the court must determine whether the ALJ's Decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record,

examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi*, 2009 WL 50140, at *21 (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) and *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). Thus, the substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Id.* (citation omitted); *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

Where, as here, a plaintiff proceeds *pro se,* the court should "read [her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) (citing *Mikinberg v. Baltic S.S. Co.,* 988 F.2d 327, 330 (2d Cir. 1993)). "Even where a motion for judgment on the pleadings is unopposed, the Court must still review the entire record and ensure that the moving party is entitled to judgment as a matter of law." *Mancebo v. Comm'r of Soc. Sec.*, 2017 WL 4339665, at *2 (S.D.N.Y. Sept. 29, 2017) (quoting *Graham v. Comm'r of Soc. Sec.,* 2017 WL 1232493, at *1 (E.D.N.Y. Mar. 31, 2017)).

### A.    The ALJ Satisfied Her Duty to Develop the Record

"Whether the ALJ has met his duty to develop the record is a threshold question" which the Court must determine "[b]efore reviewing whether the Commissioner's final decision is supported by substantial evidence." *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016). "[T]he social security ALJ, unlike a judge in a trial, must on behalf of all

claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citations omitted). It is the ALJ's duty "to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* at 112-13.

The regulations provide that before determining that a claimant is not disabled, the SSA will develop a claimant's "complete medical history for at least the 12 months preceding the month in which" a claimant files his or her application, and will "make every reasonable effort to help [the claimant] get medical reports" from her "medical sources," that is, the physicians who treated her for the conditions underlying her application. 20 C.F.R. §§ 404.1512(d) (2015), 416.912(d) (2015). "Every reasonable effort" means "an initial request for evidence" from the claimant's medical sources "and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, [] one followup request to obtain the medical evidence necessary to make a determination." 20 C.F.R. §§ 404.1512(d)(1) (2015), 416.912(d)(1) (2015).

Medical reports should include medical history, clinical and laboratory findings, diagnosis, treatment prescribed (with response and prognosis), and "[a] statement about what [the claimant] can still do despite [her] impairment(s)." 20 C.F.R. §§ 404.1513(b)(6) (2013), 416.913(b)(6) (2013). Thus, the ALJ should obtain, from the claimant's treating physicians, "expert opinions as to the nature and severity of the claimed disability." *Oliveras ex rel. Gonzalez v. Astrue*, 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008) (quoting *Pabon v. Barnhart,* 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003)) (alteration in original; internal quotation marks omitted), *report and recommendation adopted,* 2008 WL 2540816 (S.D.N.Y. June 25, 2008). *See Hooper v. Colvin*, 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016) (quoting *Molina v. Barnhart*, 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005)) ("the ALJ must 'make every reasonable effort to obtain not merely the

medical records of the treating physician but also a report that sets forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed disability'").

The ALJ's responsibility to help a claimant obtain complete medical records, including expert opinions, "dovetails with the treating physician rule, which requires controlling weight be given the opinion of a claimant's treating physician when it is supported by accepted diagnostic techniques and not inconsistent with other evidence in the record." *Oliveras*, 2008 WL 2262618, at *6. However, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013). The record must be "complete and detailed enough to allow the ALJ to determine" the claimant's RFC. *Rivas v. Berryhill*, 2018 WL 4666076, at *9 (S.D.N.Y. Sept. 27, 2018) (quoting *Roman v. Colvin*, 2016 WL 4990260, at *7 (S.D.N.Y. Aug. 2, 2016)); *see also Sanchez v. Colvin*, 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015) (record must be "robust enough to enable a meaningful assessment of the particular conditions on which the petitioner claims disability") (citations omitted).

In cases where the ALJ cannot obtain medical reports from the claimant's relevant treating physicians, or the record is otherwise "insufficient to make a disability determination," the regulations also provide "that the ALJ should ask the claimant to attend one or more consultative evaluations." *Maroulis v. Colvin*, 2017 WL 7245388, at *19 (S.D.N.Y. Jan. 18, 2017). *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (agency is responsible for "arranging for a consultative examination(s) if necessary"); 20 C.F.R. §§ 404.1512(e)(2015), 416.912(e) (2015) (agency will "[g]enerally . . . not request a consultative examination until [it has] made every reasonable effort to obtain evidence from [the claimant's own medical sources], but may "order a consultative

examination while awaiting receipt of medical source evidence"). An appropriate consultative report, combined with other evidence in the record, can provide substantial evidence for an ALJ's RFC determination and disability decision notwithstanding a lack of medical reports from treating physicians. *See Tankisi*, 521 F. App'x at 34 (record was adequate when it included, *inter alia*, two consultative opinions); *cf. Hooper*, 199 F. Supp. 3d at 815 (S.D.N.Y. 2016) (remanding for failure to develop the record where "the ALJ did not have a current opinion from even one consultative examiner, let alone from a treating physician").

In this case, the record contains no formal opinions from plaintiff's treating physicians, and no treating notes from Dr. Dunner, Dr. Fisher, or Nurse Gentes. However, the ALJ did not fail in her obligation to develop the record. The SSA (through the New York State Office of Temporary and Disability Assistance, Division of Disability Determination), mailed requests for records to the following medical sources:

- Dr. Levin: July 17, 2014 (R. 84);
- Dr. Levin: July 31, 2014 (follow up) (R. 82);
- Dr. Levin: August 14, 2014 (follow up) (R. 80);
- Narco Freedom: July 17, 2014 (R. 88);
- Narco Freedom: July 31, 2014 (follow up) (R. 83);
- Narco Freedom: August 14, 2014 (follow up) (R. 79);
- Narco Freedom: September 24, 2015 (R. 75);
- Narco Freedom: October 5, 2015 (follow up) (R. 70);
- United Medicine & Rehabilitation: September 24, 2015 (R. 71); and
- United Medicine & Rehabilitation: October 5, 2015 (follow up) (R. 69).

These were "reasonable efforts" to obtain complete medical reports from plaintiff's treating sources. *See* 20 C.F.R. §§ 404.1512(d)(1) (2015), 416.912(d)(1) (2015).[12]

---

[12] No separate requests were sent to N&FHC, where (as plaintiff's counsel informed the ALJ) plaintiff received "most of her treatment." (R. 95.) That is likely because plaintiff's Disability Report, dated July 11, 2014, did not list N&FHC as a medical provider, instead identifying "Dr. Donner [sic], Dr. Meredith Gentes [sic] and Dr. Fisher" with Narco Freedom, N&FHC's parent or umbrella organization. (R. 228.) Given that N&FHC appears to have been a d/b/a for Narco Freedom, and that they shared the same mailing address (*see* R. 88, 228, 300), I cannot fault the

Although the record does not contain treating notes or detailed opinions from Dr. Dunner, Dr. Fisher, or Nurse Gentes, it does contain some opinion evidence from Dr. Dunner (R. 305-06), as well as Nurse Gentes (R. 307), whose letter may well have been submitted in response to the requests mailed to Narco Freedom. Moreover, the record contains the consultative report of Dr. Mescon concerning plaintiff's physical impairments. (R. 294.) Ordering such a consultative examination – particularly when coupled with repeated requests for records sent to plaintiff's treating sources – can satisfy the ALJ's duty to develop the record and furnish substantial evidence for her RFC determination. *See Lora v. Colvin*, 2017 WL 4339479, at *11 (S.D.N.Y. Sept. 12, 2017) (collecting cases where an ALJ fulfilled his or her duty to develop the record "by requesting medical information from the treating physician multiple times and order[ing] a consultative examination"), *report and recommendation adopted*, 2017 WL 4339659 (S.D.N.Y. Sept. 28, 2017). *See also Martinez-Paulino v. Astrue*, 2012 WL 3564140, at *14 (S.D.N.Y. Aug. 20, 2012) ("Since the psychiatric treating records were not available despite numerous attempts to obtain them, the ALJ properly ordered a psychiatric consultative examination.").

I also conclude that the record below was complete and detailed enough to allow the ALJ to determine plaintiff's RFC. While she never received treating notes from Dr. Dunner, Dr. Fisher, and Nurse Gentes, the record does contain extensive records from treating pain management specialist Dr. Levin (R. 385-390), Dr. Mescon's consultative examination (R. 294, 297), numerous diagnostic testing results (R. 288-292, 299-303, 310-14, 316-18, 320-351), pharmaceutical records (R. 284-85, 319), and physical therapy records. (R. 352-84.) Plaintiff also testified at some length

---

agency for the manner in which it addressed its requests for medical reports. Moreover, plaintiff's counsel represented to the ALJ at the April 25, 2016 hearing that the record was complete. (R. 95.) Given that Narco Freedom had by then long ceased its operations, *see supra* at n.3, the ALJ's continued pursuit of records from its affiliated clinic would likely have been futile (as it would be now, if the Court were to remand).

at the hearing, where she was examined both by her own lawyer and by the ALJ. (R. 96-115.) On the facts of this case, the record contained "sufficient evidence from which [the] ALJ [could] assess the [plaintiff's] residual functional capacity." *Tankisi*, 521 F. App'x at 34.

### B.    Substantial Evidence Supported the ALJ's Credibility Determination

An ALJ's credibility finding is entitled to substantial deference by a reviewing court. *Rivera v. Berryhill*, 2018 WL 4328203, at *10 (S.D.N.Y. Sept. 11, 2018) (citing *Osorio v. Barnhart*, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006)). "[C]ourts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." *Marquez v. Colvin*, 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013). Thus, a court may not "second-guess" the ALJ's credibility finding "where the ALJ identified specific record-based reasons for [her] ruling," *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010), and where her determination is supported by substantial evidence. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2012). Where an ALJ rejects witness testimony as not credible, however, the basis for the finding must be set forth "with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d at 260-61 (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)).

The regulations provide a two-step process for evaluating the credibility of a claimant's assertions of pain and other symptoms:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id.*

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

In considering a claimant's symptoms of pain, an ALJ must also consider her daily activities; the "location, duration, frequency, and intensity" of her pain; any precipitating or aggravating factors; the "type, dosage, effectiveness, and side effects of any medication" taken to alleviate the pain; "treatment" other than medication received by the claimant; any "measures" used by a claimant to relieve her pain or other symptoms; and any other factors concerning the claimant's "functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) (2011), 416.929(c)(3)(i)-(vii) (2011).

In this case, I find no error in the ALJ's credibility determination. ALJ McEneaney properly followed the two-step process for evaluating the credibility of plaintiff's statements about her pain and functional limitations. (R. 17, 21.) After concluding that plaintiff suffered from a medically determinable impairment that could reasonably be expected to produce her alleged symptoms (R. 21), the ALJ addressed the factors enumerated in 20 C.F.R. §§ 404.1529(c) (2011) and 416.929(c) (2011), including plaintiff's activities of daily living (ADLs), treatment plan, medication regime, and side effects from that medication. (R. 21-22.)

Further, the ALJ provided sufficiently specific reasons for her credibility determination. She observed that plaintiff's ADLs included reading books and playing with and feeding her grandchildren. (R. 22, 98.) Plaintiff also acknowledged that she can cook, shop, and clean her apartment, and showers by herself. (R. 109.) The ALJ did not err in relying on plaintiff's ADLs in determining plaintiff's credibility. *Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (finding no error in an ALJ's credibility determination where it was "consistent with the claimant's own account of his participation in a range of daily activities during the period in question"); *Carvey v. Astrue*, 380 F. App'x 50, 53 (2d Cir. 2010) ("In rejecting Carvey's testimony as to the severity of his impairment, the ALJ reasonably relied on contrary record evidence, including extensive

objective medical test results, the aforementioned medical opinions, and Carvey's own account of his participation in a range of activities . . .")

The ALJ further observed that plaintiff had received "conservative treatment only" for her physical impairments (R. 22), consisting of physical therapy and pain medication. Plaintiff never had surgery for her back or epidural injections; nor is there any evidence that these treatments were recommended. (R. 20, 22.) Moreover, plaintiff told Dr. Mescon that, with medication, her pain dropped from "7/10 to 4/10" (R. 22), and testified, at the hearing, that her medication reduced her pain to "mild." (R. 103-04.) The ALJ also noted that while plaintiff's hypertension medications caused dizziness and confusion, these symptoms "only last for a few minutes." (R. 22; *see also* R. 113.)

These were permissible factors for the ALJ to consider in determining plaintiff's credibility pursuant to 20 C.F.R. §§ 404.1529(c)(1) (2011) and 416.929(c)(1) (2011). While conservative treatment alone is not grounds for an adverse credibility finding, *see Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008), the ALJ may take it into account along with other factors. *See Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) (the ALJ was permitted to weigh a claimant's "conservative treatment" regimen in determining that claimant's credibility); *Dixon v. Berryhill*, 2017 WL 3172849, at *16 n.33 (S.D.N.Y. July 26, 2017) ("Courts in this Circuit routinely uphold credibility determinations in which the ALJ finds a claimant's statements about their symptoms not credible based, inter alia, on a conservative treatment record.") (citations and quotation marks omitted) (collecting cases). The ALJ also permissibly considered the statements that plaintiff made to Dr. Mescon (including that she did the cleaning, laundry, and shopping, and that her pain went down to 4/10 with analgesic medications) and Dr. Mescon's observations concerning plaintiff's gait, stance, and presentation during the consultative exam. (R. 294-95.)

I therefore conclude that the ALJ's credibility assessment was free from legal error and supported by substantial evidence.

## C.    Substantial Evidence Supported the ALJ's RFC Determination

As noted above, a claimant's RFC is the most she can do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945; *see also* SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). The ALJ must assess the claimant's RFC based on all the relevant medical and other evidence of record, and take into consideration the limiting effects of all the claimant's impairments. *See* SSR 96-8p, 1996 WL 374184, at *2, 5.

When evaluating medical opinion evidence to inform an RFC, an ALJ must generally give more weight to the opinion of a source who has examined a claimant than a source who has not. 20 C.F.R. §§ 404.1527(c)(1) (2012), 416.927(c)(1) (2012). Similarly, an ALJ must generally give more weight to the opinion of a source who treated a claimant than a source who did not. 20 C.F.R. §§ 404.1527(c)(2) (2012), 416.927(c)(2) (2012). If an ALJ finds a treating source's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence" in the record, the ALJ must give that opinion controlling weight under the treating physician rule. 20 C.F.R. §§ 404.1527(c)(2) (2012), 416.927(c)(2) (2012). That rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2) (2012), § 416.927(c)(2) (2012).

However, only the opinions of "acceptable medical sources" – physicians, psychologists, optometrists, podiatrists, and speech-language pathologists – qualify for the treating physician

rule. *See* 20 C.F.R. §§ 404.1513(a) (2013), 416.913(a) (2013); *see also* 20 C.F.R. §§ 404.1527(a) (2012), 416.927(a)(2) (2012) (defining "medical opinions" as opinions from acceptable medical sources). Nurse practitioners are not "acceptable medical sources." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("the diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician"); *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (opinions of physician's assistant and nurse practitioner "do not demand the same deference as those of a treating physician").

If the opinion of a treating physician is either absent or deemed not controlling, the ALJ must weigh all the medical and other evidence in the record. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Moreover, while medical sources may provide opinions concerning the claimant's specific functional limitations, the ALJ is ultimately tasked with determining a claimant's RFC based on the record as a whole. *See* 20 C.F.R. §§ 404.1527(d)(2) (2012), 404.1545(a)(3), 404.1546(c), 416.927(d)(2) (2012), 416.945(a)(3), 416.946(c).

In this case, the ALJ did not err in stating that "no treating source has offered an opinion as to the nature and severity of plaintiff's impairments, or how they impact her ability to perform basic work-related activities," and therefore that the treating physician rule was "not applicable in this instance." (R. 22.)[13] Nor did the ALJ err in giving "significant" weight (*id*.) to the opinion of

---

[13] Dr. Dunner's one-page Functional Assessment Form provided no description of plaintiff's symptoms, much less any specific functional limitations. Instead, he checked a box indicating that as of May 20, 2014, plaintiff was "[u]nable to work for at least 12 months." (R. 290.) It is "well established that a treating physician's conclusory statements that a claimant is disabled or unable to work are not entitled to 'any special significance' in the ALJ's determination." *Campbell v. Comm'r of Soc. Sec.*, 2016 WL 6462144, at *11 (S.D.N.Y. Nov. 1, 2016) (quoting 20 C.F.R. § 404.1527(d)(3) (2012)); *see also* 20 C.F.R. § 416.927(d)(3) (same). Thus, even assuming that Dr. Dunner had an "ongoing treatment relationship" with plaintiff as to the conditions underlying her application, *see* 20 C.F.R. §§ 404.1502 (2011), 416.902 (2011), his check-mark on the Functional Assessment Form did not require any deference from the ALJ. Nurse Gentes and Nurse Skinner provided slightly more detail, but no evidence that either of them personally treated the

consultative examiner Dr. Mescon, who personally examined the plaintiff, took her medical history, reviewed her March 6, 2014 MRI report, and wrote a detailed report concluding that there were no limitations on her ability to sit, stand, climb, push, pull, or carry heavy objects. (R. 297.)

I note that the ALJ did not wholly accept Dr. Mescon's opinion. Instead, when formulating plaintiff's RFC, she limited plaintiff to "light" work,[14] and added several additional restrictions, including that plaintiff be permitted to "sit/stand alternately at will as long as she is not off task more than 5% of the work period"; that she only occasionally be required to climb ramps or stairs, stoop, crouch, kneel, and reach overhead; that she never be required to climb ladders, ropes, or scaffolds, or crawl; and that she be permitted to use a hand held assistive device (such as a cane) at all times when standing. (R. 17.) These restrictions fully accommodated the concerns articulated by Nurse Skinner, who stated that plaintiff "could not stand for long periods of time" but listed no other restrictions, and partially accommodated the longer list articulated by Nurse Gentes, as well as plaintiff's own complaints that she could not sit or stand for long periods without having to change position, could not climb many stairs, and needed a cane to get up and down and for balancing. (R. 104-08.)

The ALJ's RFC determination was also consistent with plaintiff's ADLs, including cooking, cleaning, and shopping (R. 295); with her own testimony that medication reduced her

---

plaintiff. Moreover, as noted above, nurses are not "acceptable medical sources" under the relevant regulations.

[14] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

pain to "mild" (R. 103-04) and that it "relieves" the pain to "get up and sit down and then get up again" (R. 106); and with the objective medical evidence. As the ALJ noted, the May 29, 2015 Electromyography/Nerve Conduction Study performed on May 29, 2015 (R. 335), on Dr. Levin's referral, revealed no evidence of lumbar radiculopathy (which is what Dr. Levin's office was treating her for) and no evidence of peripheral neuropathy. (R. 22.) Moreover, the nerve roots visualized on plaintiff's March 5, 2014 MRI revealed "no evidence of structural abnormality." (R. 291.) The record thus contains substantial evidence to support the ALJ's RFC determination.

To be sure, there is some evidence in the record that would support the conclusion that plaintiff had greater limitations than those the ALJ incorporated into her RFC determination. But that is not the test. "If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). Having found that the ALJ's decision was free of legal error, I am required, under the "very deferential standard of review" that applies to ALJ fact-finding, to accept the Commissioner's RFC determination. *Brault*, 683 F.3d at 448.

### D.    Remand for Consideration of Post-Decision Evidence is Not Warranted

The Act permits a reviewing court to remand a case to the Commissioner "upon a showing that there is new evidence," but only if that new evidence is "material" and there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). *Accord Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) ("the evidence must be new and material"); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) (same). Evidence is "new" if it did not exist before the ALJ's decision and it is not merely cumulative of evidence already in the record. *Tirado*, 842 F.2d at 597. Evidence is "material" where it "relates to the period on or before

the date of the [ALJ] hearing decision," 20 C.F.R. §§ 404.970(b) (1987), 416.1470(b) (1987), is probative, and there is "a reasonable possibility" that it would have influenced the ALJ's decision. *Tirado*, 842 F.2d at 597. Documents generated after the ALJ rendered a decision are not categorically barred so long as they are relevant to the time period before the ALJ's decision, for which benefits were denied. *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004). This is because new evidence may "disclose the severity and continuity of impairments existing" before the ALJ's decision and "may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations" previously. *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991) (quotation marks and citations omitted).

The record on appeal includes three categories of evidence supplied by plaintiff after the ALJ's Decision: (a) records of eleven diagnostic tests (six of which were already in the record) (R. 30-40); (b) a December 26, 2017 letter from Dr. Levin, opining on plaintiff's functional limitations (R. 29); and (c) the October 29, 2018 letter from plaintiff herself, listing her health conditions as of that date.

The six refiled diagnostic test results are not new. (*Compare* R. 31 *to* R. 348; R. 32 *to* R. 341; R. 36 *to* R. 317; R. 37 *to* R. 316; R. 38 *to* R. 318; R. 40 *to* R. 343.) *See Guerra v. Colvin*, 618 F. App'x 23, 25-26 (2d Cir. 2015) (no error where purportedly new and material medical records "were not 'new' at all – they were already included in the record, and the ALJ considered them").

The five newly-filed diagnostic test results are not material. Two of them reflect testing completed on September 8, 2017, nearly one year after the ALJ's Decision, and therefore could not undermine the ALJ's evaluation of plaintiff during the relevant period. (R. 30, 34.) *See also Guerra*, 618 F. App'x at 25 ("Most of the new medical records that Guerra submitted document her symptoms *after* August 14, 2012, the ALJ decision date; they do not undermine the ALJ's

evaluation of Guerra's condition *during the relevant period.*") (emphasis in original). The third – an Electrodiagnostic Report dated three days after the Decision on October 28, 2016 – reported evidence "consistent with" carpal tunnel syndrome (R. 33), which is an impairment that the ALJ already acknowledged (R. 15), but that did not require accommodation in plaintiff's RFC because, as plaintiff herself testified, she had no difficulty handling and fingering small objects. (R. 107-08.) The fourth is a physiologic study concluding that plaintiff had "[s]evere resting HTN" (high blood pressure) and results "consistent with" mild to moderate peripheral artery disease. (R. 39.) A similar physiologic study, dating from the prior year, was already in the record. (*See* R. 343.) The fifth new test result was another EMG/NCV Lower, conducted by Dr. Levin on July 22, 2016, which reported evidence of "a chronic denervation limited to the right lumbosacral paraspinal muscles." (R. 35.) Neither the EMG nor any other document in the record explains the significance of that finding, if any, to plaintiff's RFC.

Dr. Levin's December 26, 2017 letter (stating that plaintiff "requires" a walker, is "unable" to push, pull, or carry more than 15 pounds, and cannot "stand or sit more than 15 mins") is similarly not material. Dated fourteen months after the ALJ's October 25, 2016 Decision, the letter does not state or suggest that it describes plaintiff's limitations before that Decision. *See Florek v. Comm'r of Soc. Sec.*, 2009 WL 3486643, at *12 (N.D.N.Y. Oct. 21, 2009) (physician's assessment made nearly eleven months after an ALJ's decision was not material because it did not relate to period "on or before the date of the ALJ's decision").

Even if the letter were intended to apply retrospectively to the relevant time period, there is no "reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *O'Connell v. Colvin*, 558 F. App'x 63, 64 (2d Cir. 2014) (quoting *Tirado,* 842 F.2d at 597). For example, Dr. Levin's new statement that plaintiff "requires"

a walker is inconsistent with the record evidence, including plaintiff's hearing testimony that she "mostly" used a cane "every day." (R. 105.) Similarly, his opinion that plaintiff is unable to carry more than 15 pounds or "stand or sit more than 15 mins" is largely accommodated by the ALJ's RFC, which limits plaintiff to light work (which involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds") and to jobs that permit her to sit and stand at will. (R. 17.)

Plaintiff's October 29, 2018 letter to the Court is even less helpful to her, because it appears to be wholly unrelated to her pre-Decision condition. To the contrary: plaintiff makes it clear that the purpose of the letter was to update the Court on her post-Decision condition, writing "I have gotten far worse. To this date October 29, 2018 I can barely walk a block without resting for 2 or 3 minutes. . . . My pain remains the same. But now the pain isn't only in my back or lower back." (Dkt. No. 18.) Plaintiff then lists her "health issues . . . [a]ccording to this date and year October 29, 2018." (*Id.*) Plaintiff's statements thus clearly relate to a period years after the disability period at issue. *See Freer v. Comm'r of Soc. Sec.*, 2017 WL 5515941, at *13 n.17 (S.D.N.Y. Mar. 31, 2017) (Moses, M.J.) (declining to consider evidence that a plaintiff "submitted with his opposition letter" where that evidence related in part to appointments years after the Appeals Council's final determination), *aff'd*, 710 F. App'x 41 (2d Cir. 2018), *cert. denied sub nom. Freer v. Berryhill*, 2019 WL 1005892 (U.S. Mar. 4, 2019); *see also Marshall v. Astrue*, 2012 WL 5866077, at *12 (N.D.N.Y. Oct. 18, 2012) (finding a plaintiff's letter filed in the district court and consisting "mostly of her subjective update of her condition" irrelevant to her condition during the period for

which benefits were denied), *report and recommendation adopted*, 2012 WL 5866516 (N.D.N.Y. Nov. 19, 2012).[15]

## VI.    CONCLUSION

For the reasons stated above, and after carefully reviewing the entire record in this action and finding no error that is not harmless, the Commissioner's motion is GRANTED and the case is DISMISSED.

The Clerk of Court is respectfully directed to mail a copy of this Opinion and Order to the plaintiff.

Dated: New York, New York
       March 15, 2019

                              SO ORDERED.

                              _____

                              **BARBARA MOSES**
                              **United States Magistrate Judge**

---

[15] To the extent plaintiff believes her condition has further deteriorated, such that she is now disabled as that term is used in the Act, she may file a new application for benefits alleging disability beginning *after* October 25, 2016. *See DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir. 1998) ("DeChirico is, of course, free to file a new application for benefits, pursuant to the relevant regulations, and to present new evidence of his disability at that time."); *Faucette v. Comm'r of Soc. Sec.*, 2015 WL 5773565, at *19 (S.D.N.Y. Aug. 8, 2015) ("plaintiff is free to file a new application . . . for the period following the ALJ's decision and may present new evidence of his disability at that time"), *report and recommendation adopted*, 2015 WL 5773565, at *1 (S.D.N.Y. Sept. 30, 2015).